BOARD OF EDUCATION OF SALT LAKE CITY v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 5466.   Decided December 22, 1933.   (27 P. [2d] 805.)

*Cheney, Jensen & Marr* and *C. W. Wilkins,* all of Salt Lake City, for appellant.

*Thomas & Dahlquist,* of Salt Lake City, and *Joseph Chez,* Atty. Gen., for respondents.

STRAUP, C. J.

This is a review of a proceeding of the Industrial Commission. Helen Kimball, the applicant below, the respondent here, was a school teacher in the employ of the board of education of Salt Lake City. In her application she alleged that, while on a stepladder in the schoolroom where she was employed, decorating a Christmas tree, she, in reaching over and placing decorations on the tree, lost her balance and twisted and wrenched her spinal column, which resulted in a complete paralysis of her body below the eighth thoracic segment.

It is not disputed that whatever injury, if any, sustained by her in manner as alleged, was caused in the course of her employment. The case was heard before the commission on evidence adduced by both parties. In respect thereto, two members of the commission, one dissenting, among other things, found that on December 12, 1932, the applicant was standing on a stepladder trimming a Christmas tree at the school where she was employed, lost her balance, and, in an attempt to regain her position, twisted and wrenched her spinal column, and as a result thereof she immediately complained of pain along the left costal margin; that the pain persisted the remainder of the day and during the following night; that in the forenoon of the next day she further complained of severe pain involving the right side as well as the left, felt a tingling and numbness in the lower extremities, resulting in a paralysis and a permanent total disability from the injury sustained by her on the preceding day on the ladder.

An award, until the further order of the commission, was made requiring the board to pay the applicant $16 a week for a period not to exceed five years, and, if at the end of such period such total disability continued, further compensation was to be made "as provided by Sec. 3139 of the State Industrial Act." In addition thereto the commission awarded medical, surgical, and hospital expenses and nurse hire, in the aggregate of $1,529, and further allowed $15 a week for

a practical nurse as long as the applicant was in need of such service, and until the further order of the commission.

The board of educaiton complains of the findings as well as of the allowances made for medical and surgical service. The chief complaint is that there is not sufficient competent evidence to justify the finding that the physical condition of the applicant (a complete paralysis of the body downward from the eighth thoracic segment of which condition there is no conflict in the evidence) was caused by or attributable to the claimed accident.

The applicant was about 28 years of age, and had been a teacher in the employ of the board for about five or six years. At the time of the alleged accident, she was standing on a stepladder decorating a large Christmas tree. She was assisted by another teacher who handed ornaments to the applicant to be placed on the tree. What she did and what then happened is described by the testimony of the applicant herself. She, in substance, testified: That in the afternoon of the 12th of December she was standing on an ordinary stepladder decorating a tall Christmas tree, the tree so wide she could not get the ladder near the inner branches; that the teacher assisting her handed up the ornaments, the applicant putting them on the inner branches and leaning away to one side of the ladder; that she was reaching far over with both arms tying the ornaments on the limbs of the tree; that she was off balance quite a little bit, that something must have happened to the ladder, it either swayed or tipped in leaning, and, feeling she was falling, she quickly tried to regain her balance, and, as she tipped back towards the ladder to grab it with her hands, she felt a sharp pain in the bottom of the shoulder blade and on the left side of the back; that the pain at first was a sharp wrenching pain just as though she had given herself a sharp wrench; that it was sharp enough to take her breath a little bit; that she was frightened, thinking she was falling, and she stood a minute to collect her weight; that she mentioned it to her companion and complained of pain at the time, and

the next day they talked about it; that the pain was rather severe, at times sharp and then dull, and continued that way; that she left the school building about 4 o'clock and walked home, and that the exertion seemed to increase the pain, and on arriving home she mentioned the matter to her mother and laid down; that she did not know just what the matter was; that her mother applied hot applications, etc.; that she spent a sleepless night; that the next morning she returned to school and to her associates complained of pain in her back and that the pain was getting worse; that before noon of that day she spent most of the time in the kindergarten room with her back against the radiator, the heat of which seemed to give her some relief; that after the noon intermission the children came back into the room at about 12:30 or 1 o'clock, and, while playing the piano for the children to sing and dance, she felt that the pain was getting worse and began to travel around to the right side at about the same place as on the left side; she again complained to her associates, who advised her to go to the nurse's room and lie down; that the applicant thought it might be pleurisy and asked the nurse at the school what to do for pleurisy; that the nurse advised her to go home and call a doctor; that the applicant, who had been lying down, after walking a few steps felt that her limbs were giving way and went back and lay down, and one of the nurses of the school rubbed her back; that she then had pain practically over her whole body and was in so much pain she had difficulty in talking; that when the head nurse came in and advised her to go home, and when the applicant attempted to stand on her feet, she entirely collapsed; that she felt a tingling and numblike feeling and felt as though she was paralyzed, and seemed not to be able to move her feet; that by attendants she was carried to a taxicab and taken home, the nurses at the school accompanying her; that the family physician was summoned, who examined the applicant and found that she was paralyzed, and thereupon called a specialist.

The applicant further testified that she had pleurisy when she was 10 or 12 years of age but entirely recovered from that and thereafter was in good health all the time and had no disease or ailment of any kind, except slight colds, etc., and that she was in good health and in good physical condition all the time prior to the claimed accident.

The teacher who assisted the applicant in decorating the tree, in substance, testified: That the applicant was about halfway up the ladder and was putting ornaments on the tree which the witness had handed her; that they had been trimming the tree for fifteen or twenty minutes when she saw a jerking back movement of the applicant; that the applicant was leaning out quite a bit (the witness by her own body explained the manner in which the applicant was leaning out and jerked back); that she did not remember that the applicant at the time made any exclamation or statement of pain, but the next morning she mentioned she had "a terrible pain in her back. In fact she kept mentioning it the entire morning"; that she did not mention anything about the ladder incident or that her pain was due thereto, she thought she had pleurisy. The witness further testified that the applicant on the ladder was reaching way out into the tree, and that the applicant jerked back to regain her balance, a sort of "sudden backward movement," a motion that one would do if slipping or falling from the ladder.

Another witness, one of the nurses, testified that the day after the accident the applicant was in great pain, that she stated she thought she had pleurisy, made no mention of the ladder incident, or that her pain was attributable to that incident. The witness, however, as well as the companion of the applicant, testified that the next day shortly after the noon hour the applicant completely collapsed and was unable to stand or walk, and that she was taken home in a taxicab.

The specialist who was called in on the 13th shortly after

the applicant had been taken home, in substance, testified:
That he was a "neuropsychiatrist"; that he was called by
the family physician; that he at that time briefly examined
the applicant and found that she was paralyzed from about
two inches above the umbilicus downward, and that the par-
alysis involved the bladder and bowels and the lower limbs;
that she was in great pain, but that she had no fever nor
cough; that he caused a spinal fluid to be made under the
direction of another physician, and that he thought the
condition was "a transverse myelitis," an inflammation of
the spinal cord, and that the condition could have been "a
compression myelitis." He further testified that he used
the term transverse myelitis in a general way, but that he
did not know the cause; that, if the condition was a com-
pression myelitis, it would not necessarily be relieved if the
pressure was removed; that it would depend entirely on
the degeneration of the cord as a result of pressure; that,
if the pressure had been maintained for a sufficient time
and severe enough to destroy the tissue, then a return of
function would not be expected; that he thought the trouble
was within the cord, yet that would not necessarily indicate
an inflammation, might be an irritation or injury to the
tissues which prevented the impulses from passing a certain
level; that a continued or persistent pressure upon the spinal
cord if severe enough would cause degeneration; and that,
if degeneration occurred, there would be paralysis. Upon
a hypothetical question submitted to the doctor by a mem-
ber of the commission, in which question the incident of
the ladder was embodied as testified to by the applicant and
the pain as described by her, the doctor was asked what
the incident on the ladder had to do with the present con-
dition and paralysis of the applicant, to which the doctor
replied that "owing to the fact that I could find no other
causative factor I feel that there is a relation" and that the
paralysis would be permanent.

The doctor further testified that on his first examination
and endeavoring to get a history and the cause of the condi-

tion the applicant stated that she had been in good health, no colds and no sickness, that he had asked her if she had been in any accident, and that she replied she had not, but on the second or third day of the visits he again inquired into the history of the case and made further examinations, and, after asking the same general lines of questions, the applicant then told him that she had been on a ladder and had twisted her body; that she did not fall from the ladder; that the ladder did not fall down and said nothing about the ladder striking her or anything hitting her in the back; that she stated she had twisted her back and that she thought the ladder was going to fall and that she grabbed hold to keep from falling and that she had met with no actual bruising and no falling on the floor. He further testified that the applicant was in severe pain, that he prescribed a drug to relieve the pain, and that the applicant told him that she "experienced pain at the time she tried to balance herself on the ladder."

Another doctor, a "clinical pathologist," testified that at the request of the "neuropsychiatrist," just referred to, he extracted some spinal fluid from the spinal column; that a test of the fluid indicated an irritation somewhere within the realm of spinal fluid circulation; that he also tested slides from material that came from an operation performed by two other doctors (hereafter referred to) ; and that the slides showed the material to be an organized blood clot, portions of very recent hemorrhage, and other portions indicating different stages of hemorrhage. Upon a hypothetical question submitted to him in which the facts were embodied substantially as testified to by the applicant, he testified that the applicant jerking and trying to straighten herself up on the stepladder very possibly might provoke a hemorrhage; that the physical condition and the exact position the applicant was in and the amount of tortion and twisting, it was very probable that the hemorrhage resulted from it; and from what he knew about the case and about the applicant, he did not see what "probability" other

than the stepladder incident, had to do with the condition of the applicant.

The neuropsychiatrist treated the applicant until about the 21st of December, when, at the request of a brother of the applicant, another "neurologist and nerve surgeon" was called in to see and examine the applicant. He testified that upon his examination he found a complete paralysis from the sixth or seventh thoracic segment with a total loss of power of motion and the loss of all sensation, and further described the condition in which he found the applicant; that from his examination he reached the conclusion that "there was cord compression," and stated his reasons therefor, and subsequently confirmed that conclusion by making a "Queckenstedt test," and in some detail explained the character and purpose of the test and what it disclosed. To further confirm his conclusion that there was "a blocking of the vertebral spinal fluid," he caused the applicant to be taken to the hospital and there made further tests by injections of lipiodol and camphiodol, explaining what such processes were and what was indicated in the employment of them, and by having x-rays taken, stated his diagnosis was confirmed that the cause of the paralysis was a blocking of the fluid in the spinal column and that to remove the blocking required an operation, in surgical language called "laminectomy," which operation was performed by him assisted by one or two other surgeons, and in detail explained the character of the operation by removing the fifth, sixth, and seventh thoracic lamina and discovered a dark hemorrhage mass on the outside of and adhering to the dura membrane in which the spinal cord is inclosed; that the mass of hemorrhage was about 2½ to 3 centimeters long and from 1 to 1½ centimeters in diameter, triangular in shape, covering the dorsal surface of the cord; that he cut through the dura membrane and then could see and inspected the cord very thoroughly and from all appearances the cord was normal so far as it appeared externally; that, after he removed the clot, the blocking of the spinal fluid

was released and then circulated up and down the cord when the patient breathed; and that the clot of blood had caused a compression of the cord itself. He further testified that, since the mass compressing the cord had been removed, the recovery of the patient would depend entirely upon the amount of damage that had been done to the cord at the time of the compression, but that was difficult to determine; that the compression of the dura, the dura facing against the bone, if there be anything interposed between the dura and the bone, the spinal cord is the only thing that can be encroached upon; that there was not anything disclosed by the operation besides the mass of clotted blood that would account for the blocking in the spinal column; and that, from the history of the case, from the diagnosis made by him, and from the operation, he was of the opinion that the blocking in the spinal column was caused by the blood clot. He further testified that hemorrhage may occur from very slight trauma, and the fact that the pain came on immediately after the twisting and wrenching of the back and persisted without cessation indicated that there was a direct relation between the twisting and the hemorrhage, and that, upon the facts disclosed, such was the only thing to which the cause of the applicant's condition could be attributed. He further testified that the cord itself was injured, and that chances of ultimate outcome were not favorable.

The witness was cross-examined at some length, and stated that it was possible to start a hemorrhage by rather violent dancing, but, if so, the pain would be experienced immediately, and that anything which caused a hyperextension or hyperflexion of the spinal column to an abnormal degree might result in hemorrhage, no matter how the hyper-extension or hyperflexion occurred, but, if a hemorrhage resulted from such causes, pain would come and be experienced at that time; that pain is the first symptom of the type of injury suffered by the applicant; that the person would have some pain from the twisting or tortion

itself and the pain exaggerated or increased when the blood came in contact with the posterior roots; and that the description of the pain suffered by the applicant was characteristically that of the posterior root type. He further testified that it was his opinion that the ladder incident was the root of the trouble, based on the fact that she had immediate pain; the numbness, tingling, and paralysis following; the character and condition of the patient as disclosed by his examination; the tests made showing there was pressure on the cord; that such things can and do occur from a twisting or wrenching of the spine; and that she was well prior to the accident and free from ailments. The witness referred to medical authorities from which he read and which he claimed supported the conclusions reached by him.

The surgeon and physician who assisted the last witness in the operation was also produced as a witness. It was stipulated that he would testify, in substance, as was testified to by the preceding witness. Another physician and surgeon also was called who was present through the entire course of the operation, and it likewise was stipulated he would give similar testimony.

The petitioner, the defendant below, produced three surgeons and physicians who testified for and in its behalf. The first surgeon called testified that, in his long experience as the physician and surgeon of various mining and smelting and refining companies, he had considerable experience in treating spinal injuries. He had not examined the applicant. The opinions and conclusions expressed by him were based on testimony heard by him at the hearing and on hypothetical questions propounded to him. He stated he did not believe any one was able to say definitely, without qualification just what transpired to produce a paralysis of so complete a nature as sustained by the applicant, that in 99 cases out of 100 such cause is attributable to acute myelitis, an infection or degeneration of the spinal cord, and a swelling, or blood vessel engorgement, and that the conditions of inflamma-

tion within the cord as a rule are limited to the cord itself participating in it, as well as the membranes and the blood vessels participating in the engorgement or congestion, and that such a condition could cause a blocking, such as found by the surgeons who performed the operation. He further testified that, from the matters related, he was of the opinion that the condition persisted long enough to indicate a complete obstruction of the cord; that the condition of the cord could not result from a hemorrhage the size of that described, with no more pressure than could be produced therefrom. Reasons were given and stated by him from which he drew such conclusions. He further testified that in his opinion the condition of the applicant was not attributable to the incident on the ladder, gave reasons therefor, and stated that there must have been some antecedent, something hidden which had not yet been revealed, and that it had not been made known that the applicant experienced pain at the time of the accident. When his attention was called to the fact that the applicant so testified, he replied he was going on the testimony given by her companion, who stated that she had no recollection of the applicant making any complaint of pain at the time. He further based his opinion on the fact that the next day, without any sensation or evidence of any involvement of the lower extremities, the applicant continued in her work without complaint of pain, and that about 24 hours later she spontaneously had complete paralysis of the lower extremities. He interpreted language of the medical authorities referred to by the surgeon who performed the operation differently from the interpretation given by the operating surgeon, and in many particulars disagreed with the conclusions arrived at by the surgeons performing the operation. He further testified that there was such a thing as compression myelitis, but had not heard or found anything justifying a conclusion that the applicant had compression myelitis.

The witness was examined at some length, both on direct and cross-examination. He testified that, no matter what

was the cause of the paralysis, it was not caused by receiving a twist or wrench while on a ladder as described by the witnesses. He was asked: "Q. Is the conclusion arrived at this, there is some other cause, I know not what? Does that express it? A. Absolutely. There may be a different cause altogether. I would not go on record as stating what it is. * * * I think there is some unknown cause. I think the whole condition is unknown. * * * I don't think the blood clot had all to do with it. I am certain it had nothing to do with it. The hemorrhage may have been a factor but I think there were conditions inside of the dura and not all outside. If it were myelitis it would be a factor in producing the same thing," and could give rise to spinal blocking. "My opinion is that it is myelitis. I am not certain that it is myelitis. It is the most probable thing to me and that the inflammation between the cord and dura can give rise to sufficient adhesions to block the circulation." He further testified that, by his statement that there was something hidden in the case which had not been revealed, "I mean by that that my testimony is based on what is most probable, considering everything from start to finish. The history and the condition of the patient and the operative findings and everything else. I can't prove it is myelitis. I can't believe that this little blood clot produced this great damage that it is supposed to have produced."

Another physician and surgeon called by the petitioner testified that, "from the history of Miss Kimball's case and from all the evidence presented up to date my opinion in this case is that although we have a hemorrhage here, there is some actual pathology within the cord or within the meninges causing some other condition other than hemorrhage causing the actual paralysis. * * * The possibility of actual hemorrhage here causing the pressure within the cord at that level with the crushing as described by that girl is something that I can't conceive of, as an actual cause for the hemorrhage," and that there is not anything about the motion on the ladder as described that would be

any different from that which might be attendant upon dancing or tying shoes or doing housework and things that a young girl usually indulges in, and that the position of the applicant "on the ladder makes the thoracic vertebrae almost immobile." It was stipulated that, in other particulars the witness would testify similar to the testimony of the preceding witness.

The other surgeon and physician called testified that he "believed, after listening to not only the evidence here but previously having examined Miss Kimball (the day before) and obtained her history, that the condition at this time is due to some intrinsic disease of the spinal cord; and I base that conclusion upon my physical findings and the history. I believe that I would be willing to say that that diagnosis is a type of myelitis which we call 'syringomyelitis' or a similar condition to what we call 'hydromalia.'" He described such condition as an accumulation of fluid in the spinal column, that it has a tendency to dilate and spread from within the spinal cord and cause an interruption of the function of the cord below the level of the accumulation of fluid. He was asked: "Q. Do you think the incident that occurred while she was trimming a Christmas tree on the ladder had anything to do with the condition you found? A. Obviously it would not cause that condition, because that condition has an unknown causation. * * * It is hard for me to conceive of such an accident influencing a disease in the spinal cord. However, I would not theorize on whether or not such an accident would have influenced it or not. I can't believe it would have much influence. That is all I can say." The witness at some length, both on direct and cross-examination, explained his reasons for arriving at such a conclusion. He further testified that he was firmly of the opinion that the blood clot could not compress the cord, and, when asked what caused the blocking of it, he stated that it was the internal expansion, the collection of fluid in the central canal of the cord which caused it to expand against the bony face of the spinal column.

The foregoing is a substance of all the testimony adduced at the hearing. It is quite apparent that there is a direct conflict in the opinions and conclusions of the medical witnesses. The qualifications of all of them were admitted. There is not anything to indicate that any of them were prejudiced or biased or had any motive in giving testimony. There likewise is a conflict in the evidence as to whether the applicant at the time of the incident on the ladder made immediate exclamation or statement of pain. The applicant testified that she at the time made such complaint to her companion. Her companion testified she had no recollection of the applicant making any such statement at the time or later on that day; but on the morning of the next day the applicant complained of very severe pain.

Though to a layman it may appear improbable that the condition from which the applicant was suffering was attributable to the incident on the ladder with no more violence than as described, yet, on the testimony of the physicians and surgeons who gave testimony on behalf of the applicant, there is sufficient competent evidence to justify the finding that the paralysis was due to such incident. Such conclusion is to some extent corroborated from the fact that prior to such incident the applicant was in good health and free from any physical ailment. The case is one where a finding by the commission either way would be supported by sufficient competent evidence. It may be argued and the commission may have thought that the testimony of the physicians and surgeons who attended the applicant and treated her and who performed the operation and testified as to the conditions found by them as the result of the operation, was of greater weight than the testimony of the surgeons and physicians called by the board who merely expressed opinions and conclusions on testimony heard by them and on hypotheses submitted to them. While on such testimony and hypotheses the physicians and surgeons called by the board gave their opinion that the condition of the spinal cord was myelitis, an infec-

tion or degeneration of the cord, yet those who performed and witnessed the operation and saw the cord exposed as a result of the operation testified that no such condition of the cord was present. On the record the commission had the right to find that there was no myelitis condition of the cord and that the blocking of the cord was due to a blood clot caused from a twisting and wrenching of the spinal column on the ladder. The members of the commission themselves divided on the proposition. It may be conceded there was room for such difference of opinion. The dissenting member took the view that the conclusion that the paralysis was the result of the incident on the ladder was conjectural and that the paralysis was due to other causes. Such view has support by the testimony of the physicians and surgeons called by the board. However, the contrary view and as found by the commission is supported by the testimony of the physicians and surgeons called by the applicant. It has been the uniform holding of this court that, on a conflict of material and competent evidence justifying a finding either way, a finding made by the commission will not be disturbed; that in such case the credibility of witnesses and the weight to be given to their testimony is one of fact for the commission.

Now as to the allowance made for medical and surgical service. The aggregate amount allowed for such service, nurse hire, and hospital expense is large. But the case is an unusual one. Apparently no complaint is made as to the expenses allowed for hospital expenses or nurse hire. The complaint is as to the amount allowed for medical and surgical services in the performance of the operation. The two surgeons performing it were each allowed $250; one of them an additional allowance for services rendered in attending and treating the applicant. Some evidence was given to show that the amount allowed was reasonable. But, aside from that, the parties at the suggestion of the chairman of the commission stipulated that, in case there was any question about the bills, the matter could be referred to "coun-

sel of the physicians for adjudication," from which it seems the allowance was not final until such adjudication was had.

From a consideration of the whole record, we are of the opinion that the award made by the commission should be affirmed. Such is the order; costs to the respondent.

ELIAS HANSEN, FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.